1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**Keith Altman (SBN 257309)**
**The Law Office of Keith Altman**
**33228 West 12 Mile Road, Suite 375**
**Farmington Hills, MI 48334**
**(516) 456-5885**
**kaltman@lawampmmt.com**

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**AMBASSADOR MARC GINSBERG AND THE COALITION FOR A SAFER WEB**

                              **Plaintiffs,**

        **v.**

**APPLE, INC.**

                              **Defendant**

**CASE NO: 5:21-cv-00425**

**FIRST AMENDED COMPLAINT FOR DAMAGES**

**JURY TRIAL DEMANDED**

**PLAINTIFFS AMBASSADOR MARC GINSBERG AND THE COALITION FOR A SAFER WEB BY AND THROUGH THEIR ATTORNEYS KEITH ALTMAN OF THE LAW OFFICE OF KEITH ALTMAN, STATE AS FOLLOWS:**

## INTRODUCTION

1.    This is a lawsuit seeking damages and injunctive relief against Defendant Apple, Inc. for allowing Telegram to be made available through Apple's App Store despite Apple's knowledge that Telegram is being used to intimidate, threaten, and coerce members of the public.

2.    Apple has clearly defined policies and guidelines prohibiting applications such as Telegram from being used in such a manner yet chooses not to enforce those policies and guidelines.

3.    As a result, consumers such as Plaintiff Ambassador Marc Ginsberg has suffered economic losses as well as emotional distress as a member of one of the groups targeted by Telegram's users.

## PARTIES

4.    Plaintiff Ambassador Marc Ginsberg ("Ambassador Ginsberg") is a citizen of the state of Maryland and is the owner of Defendant Apple's iPhone XR which he obtained for personal and professional use in early 2020. As part of his purchase of the iPhone, Ambassador Ginsberg knew that Apple, Inc. had an App Store where various third-party application developers could make their applications

available to users. He further knew that Apple had terms of service and policies related to the use of the iPhone and to applications available through the App Store. Ambassador Ginsberg relied on Apple to comply with its own polices and terms of service when deciding to purchase his iPhone

5. Ambassador Ginsberg has had a career that has placed him in the public spotlight numerous times through his work as a White House liaison for the Secretary of State, as a Deputy Senior Advisor to the President for Middle East Policy, as a United States Ambassador to Morocco, and his numerous appearances in U.S. and global publications and news shows.

6. Ambassador Ginsberg was raised in Israel and has addressed Jewish groups in the United States and throughout the Arab world on the importance of Judaism and Israel. Ambassador Ginsberg has been a member of and involved with the Beth El synagogue in Bethesda, Maryland for decades as well as other synagogues in Montgomery County, Maryland.

7. As the first Jewish ambassador to an Arab country from the U.S., Ambassador Ginsberg has been subjected to two assassination attempts due to his religious beliefs held as an United States Ambassador.

8. Ambassador Ginsberg created the Coalition for a Safer Web to compel social media platforms to end their tolerance of anti-Semitism as well as their enabling of extremist groups to operate with impunity over social media.

9.      Plaintiff Coalition for a Safer Web ("CSW") is a 501(c)(3) organization with its principal place of business located in Washington, D.C. CSW employs Ambassador Ginsberg and reimburses him for his professional use of his Apple iPhone XR.

10.     Defendant Apple, Inc. ("Apple") is a California corporation headquartered in Cupertino, California and has its principal place of business in California. At all times relevant to this action, Defendant Apple was directly engaged, and is currently engaged, with the marketing, promotion, management, and distribution of apps in their Apple App Store and the business of marketing, promoting, distributing, and selling Apple products such as iPhones, iPads, Apple Watches, and Mac computers within California and across the United States with the reasonable expectation that their products and apps would be used across the United States.

## <u>JURISDICTION AND VENUE</u>

11.     Defendant Apple is a California corporation, headquartered in Cupertino, and has its principal place of business in California.

12.     At all times relevant to this action, Defendant Apple was directly engaged, and is currently engaged, with the marketing, promotion, management, and distribution of apps in the Apple App Store and the business of marketing, promoting,

distributing, and selling Apple products such as iPhones, iPads, Apple Watches, and Mac computers within California and across the United States with the reasonable expectation that their products and apps would be used across in United States.

13.    Plaintiff Marc Ginsberg ("Ambassador Ginsberg") is a citizen of the state of Maryland and is the owner of one of Defendant Apple's iPhone XR which he obtained for personal and professional use.  Ambassador Ginsberg has suffered damages through his purchase of his iPhone and is suffering from negligent infliction of emotional distress in an amount that exceeds $75,000.  Furthermore, Ambassador Ginsberg is seeking to enjoin Apple from allowing Telegram to be available in the App Store in violation of Apple's policies and terms of service.

14.    Plaintiff Coalition for a Safer Web ("CSW") is a 501(c)(3) organization with its principal place of business Washington, D.C., and is responsible for reimbursing Ambassador Ginsberg for his use of his iPhone XR for business use. At this time, these costs are being accrued by CSW and Ambassador Ginsberg must use his own money to pay the bill while he awaits reimbursement.  CSW has an obligation to pay these accrued costs when funds become available and exist as a liability of the company.

15.    Jurisdiction in federal court is proper under 28 U.S.C. § 1332 as Ambassador Ginsberg and CSW are citizens of different states as Defendant Apple and the amount in controversy exceeds $75,000.

16.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

17.     Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391 as Defendant may be found or transacts business in this district and a substantial part of the events giving rise to Plaintiffs' claims occurred and are continuing to occur in this district.

## FACTS CONCERNING DEFENDANT APPLE, INC.

18.     Defendant Apple launched its App Store in 2008.[1]

19.     Between 2013-2018, Defendant Apple has sold at least 1,197.04 million units of Apple iPhones worldwide.[2]

20.     Since 2017, Apple iPhones have been priced anywhere from $699+ to $1099+.[3]

21.     Over the past decade, Defendant Apple has sold more than 500 million iPads.[4]

22.     Currently, Defendant Apple sells the iPad Mini 5 for $399+, the 2020

---

[1] App Store https://www.apple.com/newsroom/2018/07/app-store-turns-10/
[2] Apple iPhone Sales: https://www.statista.com/statistics/276306/global-apple-iphone-sales-since-fiscal-year-2007/#:~:text=In%20their%202018%20fiscal%20year,stayed%20relatively%20stable%20since%20then.
[3] Apple iPhone Prices: https://www.computerworld.com/article/2604020/the-evolution-of-apples-iphone.html#slide19
[4] Apple iPad Sales: https://www.theverge.com/2020/9/15/21438305/apple-ipad-sales-500-million-units-10-year-anniversary

iPad is $329+, the 2020 iPad Air is $599+, the 12.9-inch iPad Pro is $999+, the 11-inch iPad Pro is $799+, the 12.9-inch iPad Pro is $799, and the 11-inch iPad Pro is $649+.[5]

23.    In 2018 and 2019 alone, Defendant Apple sold 53.2 million Apple Watches worldwide.[6]

24.    Defendant Apple sells the Series 3 Apple Watch for a starting price of $199, the Apple Watch SE S5 for a starting price of $279, and an Apple Watch Series 6 for a starting price of $399.[7]

25.    One of the principal reasons why consumers such as Ambassador Ginsberg purchase Apple products is because of the Apple App Store and the apps contained therein.

26.    Apple has established terms of use and development guidelines for the use of their products as well as the App Store.  Consumers, such as Ambassador Ginsberg are expected to comply with the terms of service and guidelines. Furthermore, as part of their purchase and use of Apple products, consumers such as Ambassador Ginsberg are entitled to reasonably rely that Apple will comply with its own policies and guidelines

27.    In particular, Apple requires that applications such as Telegram must go

---

[5] Apple iPad prices: https://www.lifewire.com/ipad-comparison-chart-1994214
[6] Apple Watch Article: https://www.fool.com/investing/2020/02/08/apple-sold-over-30-million-apple-watches-in-2019.aspx
[7] Apple Watch Prices: https://appleinsider.com/inside/apple-watch

through a review process and comply with certain guidelines before becoming available on the App Store.  Apple publishes these review guidelines[8].  *See* Exhibit "A."

28.   Specifically, with respect to the Telegram application, Apple has allowed Telegram to be distributed through the App Store knowing that Telegram does not comply with Apple's developer guidelines and that Telegram is routinely used to violate California's hate speech law, California Penal Code § 422.6.

## FACTS CONCERNING TELEGRAM

29.   Telegram was founded by CEO Pavel Durov and is currently based in Dubai after leaving Russia, Berlin, London, and Singapore due to local IT regulations.[9]

30.   Defendant Apple allows the Telegram Messenger app access to its App Store.  On Defendant Apple's App Store, the Telegram Messenger app has a 4.3-star rating with over 106,900 Ratings.[10] Defendant Apple allows the Telegram Messenger app to be downloaded for the iPhone, iPad, and Apple Watch.

---

[8] https://developer.apple.com/app-store/review/guidelines/
[9] *Id.* [FAQs]
[10] Telegram App Store Preview: https://apps.apple.com/app/telegram-messenger/id686449807

31.     As of December 2020, the Telegram Messenger app has been downloaded on the Apple App Store an estimated 6 million times worldwide.[11]

32.     On Defendant Apple's App Store Preview, the Telegram Messenger app provides the following information about the app:

- Telegram has over 400 million active users.
- Telegram is the fastest messaging app on the market, connecting people via a unique, distributed network of data centers around the globe.
- You can access your messages from all your devices at once.
- You can send media and files, without any limits on their type and size.
- Your entire chat history will require no disk space on your device, and will be securely stored in the Telegram cloud for as long as you need it.
- We made it our mission to provide the best security combined with ease of use.
- Everything on Telegram, including chats, groups, media, etc. is encrypted using a combination of 256-bit symmetric AES encryption, 2048-bit RSA encryption, and Diffie–Hellman secure key exchange.
- You can create group chats for up to 200,000 members, share large videos, documents of any type (.DOCX, .MP3, .ZIP, etc.), and even set up bots for specific tasks.
- It's the perfect tool for hosting online communities and coordinating teamwork.
- Built to deliver your messages in the minimum bytes possible, Telegram is the most reliable messaging system ever made.
- It works even on the weakest mobile connections.
- Telegram is free and will always be free.
- We take your privacy seriously and will never give third parties access to your data.

---

[11] SensorTower Telegram iOS downloads: https://sensortower.com/ios/us/telegram-fz-llc/app/telegram-messenger/686449807/overview

- For those interested in maximum privacy, Telegram offers Secret Chats. Secret Chat messages can be programmed to self-destruct automatically from both participating devices. This way you can send all types of disappearing content — messages, photos, videos, and even files. Secret Chats use end-to-end encryption to ensure that a message can only be read by its intended recipient.; and
- We keep expanding the boundaries of what you can do with a messaging app. Don't wait years for older messengers to catch up with Telegram — join the revolution today.[12]

33. Additionally, as per Version 7.3.1 of the Telegram Messenger app on Defendant Apple's App Store, Defendant Apple's program Siri can "read incoming messages aloud in your headphones."[13]

34. According to Telegram's website FAQs, Telegram for iOS was launched on August 14, 2013.[14]

35. In addition to Telegram's app offerings on Defendant Apple's App Store, users of Telegram can use Telegram's web version or install a desktop app for macOS.[15]

36. According to Telegram's website, "Telegram is a cloud-based mobile and desktop messaging app with a focus on security and speed."[16] Further, as per their website, Telegram claims to:

- be "so simple you already know how to use it".
- have messages that are heavily encrypted that "can self-destruct".

---

[12] *Id.* [app store]
[13] *Id.* [app store]
[14] Telegram Website FAQs: https://telegram.org/faq
[15] *Id.* [FAQs]
[16] Telegram Website: Telegram.org

- allow users to access chats from multiple devices.
- deliver messages "faster than any other application".
- have no limits on the size of user's media and chats.
- keeps messages safe from "hacker attacks".
- allow groups that can hold up to 200,000 members.[17]

37.     In addition to creating groups for up to 200,000 people, Telegram allows users to create channels to broadcast to unlimited audiences.[18]

38.     Telegram claims to be "for everyone who wants fast and reliable messaging and calls" and allows users to create "[p]ublic groups [that] can be joined by anyone and are powerful platforms for discussions and collecting feedback."[19]

39.     Telegram allows users to "share an unlimited number of photos, videos and files (doc, zip, mp3, etc.) of up to 2 GB each."[20]

40.     Telegram draws many users which use their devices and Telegram's services to promote and/or engage in illegal activity. In fact, Telegram's FAQ includes the following language:

> Q:     There's illegal content on Telegram. How do I take it down?
>
> A:     All Telegram chats and group chats are private amongst their participants. We do not process any requests related to them.[21]

---

[17] *Id.* [telegram home]
[18] *Id.* [FAQs]
[19] *Id.* [FAQs]
[20] *Id.* [FAQs]
[21] *Id.* [FAQs]

41.     Additionally, in response to the question "[w]hat are your thoughts on internet privacy?" Telegram's FAQ states, in pertinent part:

- At Telegram we think that the two most important components of Internet privacy should be instead:
  - Protecting your private conversations from snooping third parties, such as officials, employers, etc.
  - Protecting your personal data from third parties, such as marketers, advertisers, etc.
- This is what everybody should care about, and these are some of our top priorities. Telegram's aim is to create a truly free messenger, without the usual caveats.[22]

42.     Telegram FAQs claims the following in response to a question regarding third-party takedown requests:

"Our mission is to provide a secure means of communication that works everywhere on the planet. To do this in the places where it is most needed (and to continue distributing Telegram through the App Store and Google Play), we have to process legitimate requests to take down illegal *public* content (e.g., sticker sets, bots, and channels) within the app. For example, we can take down sticker sets that violate intellectual property rights or porn bots." (emphasis added)

"Please note that this does not apply to local restrictions on freedom of speech. For example, if criticizing the government is illegal in some country, Telegram won't be a part of such politically motivated censorship. This goes against our founders' principles. While we do block terrorist (e.g. ISIS-related) *bots and channels*, we will not block anybody who peacefully expresses alternative opinions."[23] (emphasis added)

---

[22] *Id.* [FAQs]
[23] *Id.* [FAQs]

43.    While the above information applies to public channels, such information does not apply to private groups which can contain upwards of 200,000 individuals. As for this data, Telegram provides the following information:

- Secret chats use end-to-end encryption, thanks to which we don't have any data to disclose.
- To protect the data that is not covered by end-to-end encryption, Telegram uses a distributed infrastructure. Cloud chat data is stored in multiple data centers around the globe that are controlled by different legal entities spread across different jurisdictions. The relevant decryption keys are split into parts and are never kept in the same place as the data they protect. As a result, several court orders from different jurisdictions are required to force us to give up any data.
- Thanks to this structure, we can ensure that no single government or block of like-minded countries can intrude on people's privacy and freedom of expression. Telegram can be forced to give up data only if an issue is grave and universal enough to pass the scrutiny of several different legal systems around the world.
- To this day, we have disclosed 0 bytes of user data to third parties, including governments.
- Telegram groups are ideal for sharing stuff with friends and family or collaboration in small teams. But groups can also grow very large and support communities of up to 200,000 members. You can make any group public, toggle persistent history to control whether or not new members have access to earlier messages and appoint administrators with granular privileges. You can also pin important messages to the top of the screen so that all members can see them, including those who have just joined.
- Channels are a tool for broadcasting messages to large audiences. In fact, a channel can have an unlimited number of subscribers.[24]

---

[24] *Id.* [FAQs]

44.     Since its launch in 2013, Telegram has been the subject of derision for facilitating voices of violence and extremism.

45.     Most recently, in the wake of the killing of George Floyd, Telegram has played an essential role in threatening as well as encouraging and coordinating racist and anti-Semitic violence.

46.     CSW issued several press releases bringing the real and imminent dangers of Telegram to the attention of Apple.

47.     On June 3, 2020, CSW issued a press release, revealing a torrent of extremist incitement, notably anti-Semitic and anti-African American content on Telegram, stemming from white supremacist/ Neo-Nazi communications in the wake of the George Floyd murder and the resulting global protests.[25]

48.     The CSW uncovered encrypted capacity by extremist fringe groups to direct violence, including looting, where police presence is minimal.

49.     On June 18, CSW issued a second Telegram related press release demonstrating representational evidence that Telegram is serving as a communications channel for the Russian government and affiliated Neo-Nazi and white nationalist groups, sowing misinformation and racial division in the United

---

[25]June 03, 2020 – CSW Demands Action Against the TELEGRAM White Nationalist/Anti-Semitic/Anti-Black Riot Incitement App.

States and in Europe, with the goal of provoking African American-on-Jew violence.[26]

50.    Further on July 24, 2020, Ambassador Ginsberg sent on behalf of CSW a letter to Tim Cook, CEO of Apple calling on Apple to (temporarily) de-platform the Telegram app from Apple's App Store, reiterating the seriousness of Telegram's role in inciting extremist violence. [27] *See* Exhibit "B"

51.    Telegram is currently the most utilized messaging app among extremists who are promoting violence in the United States.   Telegram has been deemed "extremists app of choice" by POLITICO.[28]

52.    For years, anti-black and anti-Semitic groups have openly utilized Telegram with little or no content moderation by Telegram's management. Despite warnings from CSW and other organizations, extensive media coverage, legal warnings, and other attention that Apple is providing an online social media platform and communication service to hate groups, Apple has not taken any action against Telegram comparable to the action it has taken against Parler to compel Telegram to improve its content moderation policies.

---

[26] June 18, 2020- TELEGRAM App is the Misinformation "Super Spreader" to Foment U.S. Racial Division & Violence.
[27] June 24, 2020- TELEGRAM APP'S ROLE INCITING EXTREMIST VIOLENCE
[28] Alexandra S. Levine, "Telegram Surfaces as Preferred app of Extremist Rioters," *Politico* (June 4, 2020), https://www.politico.com/newsletters/morning-tech/2020/06/04/telegram-surfaces-as-preferred-app-of-extremist-rioters-788230

53.     Speech that carries a credible threat of violence against a person or a group on the basis of race or religion is a criminal offense in California.  *See* California Penal Code § 422.6.

54.     Telegram promotes extremist conduct in violation of both state and federal law.

55.     Telegram currently serves as the preferred Neo-Nazi/white nationalist communications channel, fanning anti-Semitic and anti-black incitement during the current wave of protests across America.

56.     Telegram  continues to enable extremist incitement in its platform, promoting political violence as extremist groups and individuals migrate to Telegram following Apple's suspension of Parler.

57.     Telegram has and continues to be used as a channel to cultivate and maintain an image of brutality and to instill great fear and intimidation by disseminating videos and images of numerous threats to kill, images depicting and encouraging racist and anti-semantic violence, and dehumanizing certain groups of people.

58.     In the wake of the murder of George Floyd, these abhorrent postings inciting and encouraging violence have become more frequent, specifically threatening people of color and Jewish people.

59.     On September 28, 2020, a telegram user under the account name "N**** and Heeb Crime Report" posted a photo of a woman holding a sign that reads "Kill Black People."



60.     The same account also posted the below image of a well-known climate change activist photo shopped to appear to be holding a sign that reads "Kill all n****** for climate."

61.   Further, the same account posted an image (inserted below) depicting a white man next to a dead and dismembered African American person with a caption that reads "The only thing n****** understand are pain and fear."

62.   In  addition to racist posts encouraging and violence against African American people, there are also anti-Semitic posts used to threaten and encourage violence against people of the Jewish faith.

63.   Below are some examples of anti-Sematic postings encouraging and, in some cases, directly threatening violence against Jews:



1
2
3
4
5
6
7
8
9
10



11
12
13
14
15
16
17



18

We will finish what you started.

19
20
21
22
23
24
25
26
27
28



64.     Telegram further engaged in facilitation of anti-Semitic and anti-black extremism and violence during the Black Lives Matter ("BLM") protests throughout summer of 2020.

65.     Telegram has been used to cultivate and maintain an image of brutality, to instill great fear and intimidation by posting images and videos encouraging racist and anti-Semitic killings.

66.     Telegram's media platform and services provide tremendous utility and value to racist and anti-Semitic groups as a tool to connect its members and to facilitate these group's ability to communicate, recruit members, plan and carry out attacks, and strike fear in its enemies.

67.     These have groups relied on Telegram as an important tool to facilitate and carry out its terrorist activity, including the attack on the United States Capital that took place on January 6, 2021.

68.     Telegram is currently being used to coordinate and incite extreme violence before the inauguration of President Elect Joe Biden on January 17, 2021. Some users have called on followers to abandon plans for a second protest in Washington in favor of surprise attacks nationwide.[29]

69.     One Telegram message on a far-right channel called "Boogaloo Intel Drop" told followers to "get a feel for your local area and get your friends together."

_____

[29] https://www.washingtonpost.com/national-security/far-right-violent-plans-inauguration/2021/01/14/15668f16-567d-11eb-a817-e5e7f8a406d6_story.html

The message encouraged other Telegram users to find others who are outraged about the death of Ashli Babbitt, who was shot by a police officer while storming the Capitol. The posting further read: "No, we're not going to tell you 'show up on XX day and do XX,' which would risk alerting authorities," the message continues, advising followers to "have some damn ingenuity and autonomy."[30]

70.     The following is an image containing a caption that reads: "When democracy is destroyed refuse to be silenced, armed march on Capitol Hill & all state capitals. January 17th, 2021 @ 12:00pm"

//

//

//

//

//

---

[30] *Id.*

1
2
3
4
5
6
7
8
9
10
11
12
13



14      71.     In this case, Telegram is being used to specifically threaten the United

15  States Government.

16
17      72.     In addition to postings to incite violence and spread hate, Telegram also

18  serves as a platform to purchase and sell illegal substances.

19
20      73.     Below is a posting offering for sale and pricings of illegal and controlled

21  substances such as LSD, acid, and cocaine pills.

22  //
23  //
24  //
25  //
26  //
27  //
28

1 ounce cost $450

25) 1 sheet LSD containing 100 shits
150ug for $175
200ug for $220
300ug for $250

26) ecstasy
$8 per pill minimum order is 50pills

27) molly
110$ per gram minimum order is 3g

28) Zopiclone 10mg 1k €400

Get the best deals Pill/drugs for sale
1) subutex 2mg (sublingual tabs)
30 tabs $110
90 tabs $300
2) Roxicodone 30mg (PHYSICIANS TC)100 tabs $200
Roxicodone 30mg (PHYSICIANS TC)
120 tabs $230
4) RITALIN 10mg 100 pill $115
RITALIN 10mg 200 pill $215
5) Ketamine (Ketamine Hydrochloride) - Infar 100mg/ml
Solution 10ml vial $70
6) Ketalar 50mg/ml 10ML Injection $65
7)Demerol 50mg/ml 30ml ampul $42
8) Dilaudid 2mg/100tabs $115
DILAUDID 4mg/100tabs $128
DILAUDID 8mg/100tabs $197
8) SOMA -generic- 350mg 30 tabs 67us$

74.    Telegram, as a platform, is continuing to grow. As of January 12, 2020, at 12:20, Telegram surpassed 500 million active users. In the past 72 hours alone, more than 25 million new users from around the world joined Telegram.[31]

## FIRST CAUSE OF ACTION
## Negligent Infliction of Emotional Distress

75.    The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as if fully set forth herein.

76.    Because Ambassador Ginsberg purchased Apple's iPhone, Apple owes a duty of reasonable care to ensure that their services are not used as a means to inflict religious and racial intimidation.

77.    Defendant currently offers the Telegram app on the Apple App Store.

_____

[31] Posting showing user stats, https://t.me/OhioProudBoys/864

78.     Telegram hosts many users who openly identify as Neo-Nazis and White Supremacists.

79.     The Telegram app has been used on numerous occasions by White Supremacists and Neo-Nazis to plan, incite and implement anti-Semitic terror plots.

80.     Neo-Nazi and White Supremacists used the Telegram app to coordinate a campaign to spread misinformation during the summer 2020 Black Lives Matter protests. The goal of this misinformation campaign was to foment African American on Jewish violence.

81.     Because iPhones are the one of the most popular brands of smart phone in the world, it is reasonable to infer that a substantial number individuals that used the Telegram app to foment racial terror, downloaded the app from the Apple App Store.

82.     Telegram has become so well known as a source of racial terror plots, that the app is often referred to as "Terrorgram". Due to this high level of notoriety, Defendant Apple knew or should have known their App Store was being used to download the Telegram app for terroristic purposes.

83.     Defendant breached their duty by continuing to host Telegram on the App Store despite Defendant's knowledge that Telegram was being used to incite violence including violence against African Americans and Jews.

84.     Ambassador Ginsberg is a Jewish person whose professional work requires he maintain a presence in the public eye.

85.   Ambassador Ginsburg is aware that Telegram is used to incite violence and was terrified for his safety during the Capitol riots of January, 2021.

86.   As a result of this Anti-Semitic campaign that was coordinated on the Telegram app, Ambassador Ginsberg is forced to live in apprehension of religiously motivated violence being perpetrated against him.

87.   Ambassador Ginsberg's fear of religious violence has caused him substantial emotional harm including depression and anxiety.

88.   Despite having an awareness of the racial and religious incitement that is planned, coordinated, and implemented through Telegram, Defendant continues to host Telegram on the Apple App Store.

89.   By continuing to host Telegram on the Apple App Store, Defendant facilitates religious threats against him and his family that has caused Ambassador Ginsberg to fear for his life.

90.   If was foreseeable to Apple that by allowing Telegram to continue to be available on the App Store that Apple's conduct could lead to fear of violence by individuals, such as Ambassador Ginsberg.

91.   By failing to remove Telegram from the Apple App Store, Defendant has proximately caused Ambassador Ginsberg's emotional distress.

92.   Plaintiff Ambassador Ginsberg has suffered injuries in an amount that exceeds $75,000.

1
2
3
4
5
6

**<u>SECOND CAUSE OF ACTION</u>**

**(Violation of the "Unfair" Prong of the UCL, California Business and Professions Code § 17200 *et seq.*)**

7
8
9

93.    The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as if fully set forth herein.

10
11
12
13

94.    The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

14
15
16
17

95.    A business act or practice is "unfair" under the UCL if the reasons, justifications, and motives of the alleged wrongdoer are outweighed by the gravity of the harm to the alleged victims.

18
19
20

96.    Defendant's App developer guidelines forbid the following content from the Apple App Store[32]:

21
22
23
24
25
26

      1.1.1  Defamatory, discriminatory, or mean-spirited content, including references or commentary about religion, race, sexual orientation, gender, national/ethnic origin, or other targeted groups, particularly if the app is likely to humiliate, intimidate, or harm a targeted individual or group.

27
28

---

[32] See Exhibit "A", §§ 1.1.1, 1.1.2, 1.1.3, 1.1.5

1.1.2   Realistic portrayals of people or animals being killed, maimed, tortured, or abused, or content that encourages violence.

1.1.3   Depictions that encourage illegal or reckless use of weapons and dangerous objects, or facilitate the purchase of firearms or ammunition.

1.1.5   Inflammatory religious commentary or inaccurate or misleading quotations of religious texts.

97.    Also, in Apple's guidelines is § 1.2 on User Generated Content:

Apps with user-generated content present particular challenges, ranging from intellectual property infringement to anonymous bullying. To prevent abuse, apps with user-generated content or social networking services must include:

- A method for filtering objectionable material from being posted to the app

- A mechanism to report offensive content and timely responses to concerns

- The ability to block abusive users from the service

- Published contact information so users can easily reach you

Apps with user-generated content or services that end up being used primarily for pornographic content, Chatroulette-style experiences, objectification of real people (e.g. "hot-or-not" voting), making physical threats, or bullying do not belong on the App Store and may be removed without notice.

98.    Thus, Defendant has full managerial discretion to remove apps that violate the aforementioned guidelines.  Furthermore, Apple represents that apps in the App Store *must* include the above functionality.

99.  In the past, Apple has removed applications such as Fortnite and Parler from the App Store for violating these guidelines.

100.  Telegram users have repeatedly and systematically utilized the platform to violate Defendant's app developer guidelines since Telegram's launch in 2013. Such violations include, but are not limited to:

- Generating and distributing content expressing degradation and hatred of various racial and religious groups, particularly African Americans and Jewish people.

- Generating and distributing content that contains explicit exhortations to commit violence against various racial and religious groups, particularly African Americans and Jewish people.

- Planning and recruiting participants for acts of racial and religious based terrorism.

- Planning and recruiting participants in terrorist operations aimed at undermining the institution of United States elections and overturning the results of the 2020 United States Presidential election.

- Providing logistical support for participants of acts of terrorism.

101.   The developers of Telegram have not undertaken any meaningful actions to curb these flagrant, systematic, and continuous violations of Defendant's app guidelines by Telegram users.

102.   The aforementioned violations of Defendant's app guidelines are well known and have been widely reported by international media outlets since 2013. Defendant is therefore aware of Telegram's violations of their app guidelines.

103.   Despite having awareness of Telegram's violations of the Apple app guidelines, Defendant has not removed Telegram from the App Store nor undertaken any action to compel Telegram to come into compliance with the app guidelines.

104.   Defendant directly benefits from Telegram through information sharing agreements, advertising revenue, and sales of Apple devices to run Telegram.

105.   Ambassador Ginsberg purchased and uses an Apple iPhone XR for personal and professional purposes related to his work for CSW.   Ambassador Ginsberg is to be reimbursed for all phone and data costs related to his work with CSW.

106.   Ambassador Ginsberg premised his purchase and use of an Apple iPhone XR for personal and CSW purposes on an expectation that Defendant would enforce their app guidelines.   A portion of the cost of the iPhone was related to the benefits provided under the terms of service and policies of Apple.

107.   At the time Ambasador Ginsberg purchased the iPhone XR, he was unaware of the relationship between Telegram and Apple and was unaware that

Apple was allowing Telegram to be present on the App Store despite not complying with Apples terms of service and policies.

108.   Defendant has violated the "unfair" prong of the UCL by not following their own policies and allowing Telegram to be downloaded despite the aforementioned violations of Apple's guidelines.

109.   These acts and practices were unfair because they caused Ambassador Ginsberg to falsely believe that the Apple would comply with their own policies and terms of service.   As a result, reasonable consumers, including Ambassador Ginsberg, were induced, in part, to purchase Apple's products believing that Apple would not allow Telegram on the App Store once becoming aware of the extent of Telegram's use violating Apple's policies and guidelines.

110.   Defendant's failure to enforce their own guidelines against Telegram has caused Ambassador Ginsberg and CSW to suffer economic loss by being deprived of a key benefit of the purchase and use of the Apple iPhone XR.

111.   Part of the cost associated with Plaintiffs' transaction was related to the benefits promised under Defendant's terms of service and policies.   Because Plaintiffs paid for the iPhone, they have suffered an actual loss of money in not receiving benefits Plaintiffs paid for.

112.   The gravity of the harm to Ambassador Ginsberg and members of the public resulting from these unfair acts and practices outweighed any conceivable reasons, justifications, and/or motives of Apple for engaging in such unfair acts and

practices. By committing the acts and practices alleged above, Apple engaged in unfair business practices within the meaning of California Business & Professions Code §§ 17200, *et seq.*

113.   Plaintiffs therefore seeks injunctive relief pursuant to California Business and Professions Code § 17203 to enjoin Defendant Apple to comply with Apple's own policies and guidelines requiring Telegram to cease and desist violations or remove Telegram from the Apple App Store.

114.   Furthermore, through its unfair acts and practices, Defendant has improperly obtained money from Ambassador Ginsberg. As such, Plaintiff requests that this Court enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Ambassador Ginsberg and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## THIRD CAUSE OF ACTION
### (Violation of the "Unlawful" Prong of the UCL, California Business and Professions Code § 17200 *et seq.*)

115.   The allegations set forth in all previous paragraphs of the complaint are incorporated by reference as if fully set forth herein.

116.   The UCL defines unfair business competition to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising. Cal. Bus. & Prof. Code § 17200.

117.   A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

118.   California Penal Code § 422.6 states:

> No person, whether or not acting under color of law, shall by force or threat of force, willfully injure, intimidate, interfere with, oppress, or threaten any other person in the free exercise or enjoyment of any right or privilege secured to him or her by the Constitution or laws of this state or by the Constitution or laws of the United States [on basis of any recognized protected class such as race or religion].

119.   Users of Telegram have repeatedly and consistently used the app to plan and format racially motivated terrorist plots.

120.   Many of the Telegram users who have used the app for terroristic purposes have downloaded the app on the Apple App Store so that they may violate California Penal Code § 422.6.

121.   Apple is aware of that a substantial number of users of Telegram use the application in violation of California Penal Code § 422.6.

122.   Despite knowing that Telegram is being used to commit criminal acts, Apple continues to allow Telegram to be downloaded from the App Store.  Thus, Apple's conduct aids and abets the commission of criminal acts and is itself a violation of California Penal Code § 31 and is a violation of the "unlawful" prong of the UCL.

123.   Ambassador Ginsberg and CSW have suffered economic harm as a result of Apple's activities as discussed above in Count II of the complaint.

124.   Because of its unlawful acts and practices, Plaintiff requests that this Court enjoin Defendants from continuing to violate the UCL as discussed herein and/or from violating the UCL in the future. Otherwise, Ambassador Ginsberg and members of the general public may be irreparably harmed and/or denied an effective and complete remedy if such an order is not granted.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

(a)   Enter judgment against Defendants and in favor of each Plaintiff for compensatory damages in amounts to be determined at trial.

(b)   Enter judgment against Defendants and in favor of each Plaintiff for an injunction prohibiting the availability of Telegram through the App Store unless Telegram complies with Apple's policies and guidelines.

(c)   Enter judgment against Defendants and in favor of each Plaintiff for any and all costs sustained in connection with the prosecution of this action, including attorneys' fees.

(d)   Grant such other and further relief as justice requires.

## **JURY DEMAND**

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

Respectfully Submitted,

The Law Office of Keith Altman

Dated:    May 28, 2021                    By:    */s/ Keith Altman*
          Farmington Hills, MI                   Keith Altman (SBN 257309)
                                                 33228 West 12 Mile Road
                                                 Suite 375
                                                 Farmington Hills, MI 48334
                                                 (516) 456-5885
                                                 kaltman@lawampmmt.com

                                                 *Attorneys for Plaintiffs*